BENAVIDES, Circuit Judge:
Appellants appeal from the district court’s order denying their Motion for Summary Judgement, seeking dismissal of appellee John Mendenhall’s § 1983 civil rights complaint on the basis of qualified immunity. Because we determine that the officers acted reasonably in arresting John Mendenhall for the crime of murder, we reverse the district court and grant appellants qualified immunity on all claims asserted by Mendenhall.
I. FACTUAL AND PROCEDURAL BACKGROUND
On a fateful Friday the Thirteenth in September of 1996, William Myles at *228 tempted to rob Deon Grisby in Cullen, Louisiana. Early that morning, sometime around 7 a.m., Myles and several purported members of a drug gang accosted Gris-by while he was inside his girlfriend’s home, in what is presumed by all parties involved to be a drug-related transaction. When Grisby refused to turn over a sum of money on demand, Myles and his cohorts forced Grisby into the car they were driving. As they began to drive off, however, Grisby attempted to escape by leaping from the moving vehicle. His efforts to flee were met with gunfire. He was shot several times, as the would-be kidnappers took flight.
The exact sequence of these chaotic events is unclear, but somehow, perhaps in response to a call for help, Cullen Police Officer Jimmy Wayne White, appellee Mendenhall’s half brother, arrived shortly thereafter, in time, remarkably, to apprehend two of the renegade gang. Due to this fortuitous arrival of the cavalry, Gris-by was rushed to the hospital and his life was saved. Myles, in the meantime, escaped on foot, in the direction of Lee street.
Perhaps even more notable than his brother’s timely appearance at the scene of this shooting, John Mendenhall also arrived moments later, dressed in his police officer’s uniform, apparently on his way home from work.[1] Upon consultation with Officer White, Mendenhall gave chase to Myles.
Mendenhall was not the only individual in pursuit early that morning. Several other individuals led a small procession in the chase after Myles. Mendenhall, driving his red pickup truck, fell in behind them.
It is at this juncture that the exact sequence of events is somewhat unclear from the record. Nonetheless, one indisputable event occurred: Near the corner of Lee Street and Boucher Extension, Myles was killed instantly from a single gunshot wound to the back of the head by someone in the group that gave chase. It is the events subsequent to this shooting that give rise to this appeal.
Medical personnel arrived on the scene shortly after Myles was shot, followed by Officer White accompanying Deputy Shaw and Deputy Ashley. Sometime shortly thereafter, Mendenhall simply left the scene. Deputies Cropper and Null, both appellants in this matter, were notified and dispatched to the scene as lead investigators. Upon their arrival, they began in earnest the investigation of the presumed homicide.
The investigators’ focus soon shifted to Mendenhall, as two witnesses at the scene identified him as the shooter. In an effort to obtain his statement, appellant Deputy Newton visited Mendenhall at his home, requesting that he return to the Webster Parish Sheriffs Office sub-station in Springhill. While it does not appear that Mendenhall immediately complied with this request, he did later make an appearance at the sub-station. He was greeted by appellant-deputies Steve Cropper, Alva Null, Jim Bell, and Wayne Newton. The deputies mirandized Mendenhall, and then proceeded to inquire as to the day’s events. Mendenhall, however, refused to cooperate. He left the station shortly after arriving, and apparently reported to duty with the Haynesville Police Department.
Considering the information gathered from the day’s investigation,[2] Deputy *229 Cropper prepared a complaint-affidavit for the arrest of John Mendenhall on charges of second degree murder in violation of Louisiana law.[3] Using this affidavit, and another prepared for the purpose of obtaining a search warrant, Cropper sought and obtained a warrant for the arrest of John Mendenhall, as well as a search warrant for his home. Upon issue, the arrest warrant was faxed to Mendenhall’s place of employment, at which time he was stripped of his weapon and badge and placed into custody. Upon being processed into the system, Mendenhall was locked in the Webster Parish jail, where he spent one night, before being released on bond the next day.
Upon release, Mendenhall sought and secured counsel. A Motion for Expedited Preliminary Examination was filed on September 16 — a Monday — and the hearing was scheduled for the following Monday. Mendenhall requested the expedited hearing out of concern for his candidacy in the upcoming election for Cullen Police Chief, to be held the following Saturday. He was naturally worried about the impact of a pending murder trial on his chances in the election. His concern may have been well founded, as Mendenhall subsequently lost the election.
At the hearing, Deputy Cropper testified as to the facts and circumstances supporting probable cause. Mendenhall, in his defense, presented the affidavit of Ted Nellams, an individual indisputably at the scene of Myles’ shooting, who claimed to have fired the fatal bullet. The presiding judge, considering Nellams’ affidavit, failed to find probable cause to bind Mendenhall over for trial as required under Louisiana law.[4] The district attorney subsequently dismissed the prosecution against Menden-hall.
Mendenhall filed suit pursuant to 42 U.S.C. § 1983 nearly one year later, asserting that appellants violated his civil rights by falsely arresting him for the murder of William Myles. Each side respectively filed motions for summary judgment. Finding that “genuine issues of material fact remain in this matter” with respect to the claims made by each party, the district court denied summary judgment to all. Appellants filed a timely notice of appeal concerning the failure of the district court to grant summary judgement on qualified immunity grounds.
II. DISCUSSION
A. Jurisdiction and Standard of Review
While no party contests our jurisdiction to hear this interlocutory appeal, we write briefly to note that, although denials of qualified immunity on summary judgment are not final orders, they are immediately appealable under the collater *230 al order doctrine if based on an issue of law. See Rodriguez v. Neeley, 169 F.3d 220, 222 (5th Cir.1999) (citing Cantu v. Rocha, 77 F.3d 795, 802 (5th Cir.1996); Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).
When as here the district court fails to make specific findings of fact or state specific conclusions of law, we will "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the non-moving party, likely assumed." Behrens v. Pelletier, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). In essence, we will give the plaintiff the benefit of the doubt with regard to any disputed issues of fact, in an attempt to reconstruct the district court's findings and conclusions, and thus review ~s a matter of law whether under such a factual scenario the § 1983 complaint may proceed. See Colston v. Barnhart, 130 F.3d 96, 98-99 (5th Cir.1997). If those facts do not materially affect the outcome-i.e., if even under such a factual scenario the officers' actions may be deemed as a matter of law objectively reasonable-the denial of summary judgment is immediately reviewable as a question of law, and qualified immunity should be granted. See Id. (citing Mitchell, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Nerren v. Livingston Police Dep't, 86 F.3d 469, 472 (5th Cir.1996)).
Our review of the district court's order denying summary judgment on qualified immunity grounds is conducted de novo. See Nerren, 86 F.3d at 472 (citing Johnston v. City of Houston, Tex., 14 F.3d 1056, 1059 (5th Cir.1994)).
B. Probable Cause and Objective Reasonableness
 It is, by now, well settled and understood that "[f]ederal immunity law shields state officials from personal liability under federal law for civil damages as long as their conduct could reasonably have been thought consistent with the rights they are alleged to have violated." Cantu, 77 F.3d at 805 (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity protects against novel theories of statutory or Constitutional injury-any purported harm must stem from rights clearly established under law at the time of the incident, and the contours of that right must be sufficiently clear such that a reasonable officer would understand that his actions were violative of the right at issue. See Anderson, 483 U.S. at 638-39, 107 S.Ct. 3034. Thus, the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
When an individual asserts a claim for wrongful arrest, qualified immunity will shield the defendant officers from suit if "`a reasonable officer could have believed [the arrest at issue] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' Even law enforcement officials who `reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting Anderson, 483 U.S. at 641, 107 S.Ct. 3034); see also Babb v. Dorman, 33 F.3d 472, 477 (5th Cir.1994). "Thus, a qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause. On the other hand, `if officers of reasonable competence could disagree on this issue, immunity should be recognized.'" Babb, 33 F.3d at 477 (quoting Malley, 475 U.S. at 341, 106 S.Ct. 1092).
*231 Thus armed, we turn to the facts of the case now before us. In essence, we must determine whether the facts, viewed in the light most favorable to Mendenhall, support a finding that no reasonable officer could have believed probable cause existed to arrest Mendenhall on charges of second degree murder in the shooting death of William Myles. We note that our determination concerning probable cause is guided by the Supreme Court’s mandate in Illinois v. Gates: We look to the totality of the circumstances to determine whether probable cause, or in this case arguable probable cause, existed. 462 U.S. 213, 241, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We are mindful of the notion that “probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.” Id. at 232, 103 S.Ct. 2317. Thus we embark on a “practical, common-sense [determination] whether given all of the circumstances” a reasonable officer could have believed “there is a fair probability” Mendenhall committed the crime charged. Id. at 238, 103 S.Ct. 2317.[5]
Appellee repeatedly draws our attention to the Preliminary Examination, conducted some 10 days after his arrest, in an effort to demonstrate the purported lack of probable cause in this case. While we recognize that the state judge failed to find probable cause at the Preliminary Examination hearing, we reject the notion that this finding bears any relevance to our task in resolving this appeal. The law charges us with determining the reasonableness of the actions taken in light of the cause that existed at the time of arrest. See Hunter, 502 U.S. at 228, 112 S.Ct. 534 (citing Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (‘Whether [an] arrest [is] constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstance within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.”) (emphasis added).
Mendenhall further emphasizes in his brief that the timing of his arrest itself is suspect, and lends support to his suit. Specifically, he draws our attention to the election for police chief to be held approximately one week after he was arrested. In essence, Mendenhall contends that his arrest was executed with the intention of undermining his chances in the election.
We are compelled to note first that it defies logic to conclude appellants in this matter successfully orchestrated the shooting of Deon Grisby by William Myles, followed by a chaotic chase in which Menden-hall happened to participate, concluding in the shooting death of Myles in which Men-denhall was subsequently implicated, all out of motivation to defeat Mendenhall’s chances at the polls.
However, regardless of logic, and even assuming the worst — i.e., the appellant-deputies seized upon a mystical confluence of events to accomplish their nefarious goal of defeating Mendenhall in the upcoming election — we are compelled by our case law that clearly dictates subjective intent, motive, or even outright animus are irrelevant in a determination of qualified immunity based on arguable probable cause to arrest, just as an officer’s good intent is irrelevant when he contravenes settled law. Anderson, 483 U.S. at 641, 107 S.Ct. 3034 (citing Harlow, 457 U.S. at 815-20, 102 S.Ct. 2727).
We proceed. Mendenhall was arrested pursuant to a valid arrest warrant secured by Deputy Cropper. Cropper obtained the warrant relying on information learned by him and other investigating deputies over the course of the day of the *232 murder. While a valid arrest warrant would normally insulate officers against a claim for false arrest, in a case such as the one before us where the officers charged with false arrest were responsible for securing the warrant, we are required to test the validity of that warrant, applying the usual standards. See Malley, 475 U.S. at 345-46, 106 S.Ct. 1092.
The first and primary piece of evidence relied upon was the fact of the shooting itself. It is undisputed that Myles was killed by a single gun shot wound to the back of his head, indicating he was shot while fleeing the scene.[6]
Further information obtained from Wayne Walsh, the first emergency medical technician to arrive on the scene, pointed to Mendenhall as the prime suspect. Specifically, Walsh reported to investigating officers that Mendenhall, at the scene providing crowd control when the ambulance arrived, related that Myles was taken down by a “single head shot,” in response to inquiries concerning the circumstances of the shooting. This fact was not immediately evident, as Myles was lying face up in the road.[7] Mendenhall related firsthand information through the revelation of this fact. Further investigation proved Mendenhall correct.
Walsh further reported that Mendenhall tampered with evidence at the scene. Specifically, Walsh reported witnessing Mendenhall pick up a silver revolver that was lying at the feet of the victim, uncham-ber the rounds of ammunition in the weapon, examine them, replace them in the chamber, and then place the weapon back on the ground in essentially the same position in which it was originally found.[8]
This foregoing information was obtained without the benefit of John Mendenhall, as shortly before investigating officers Cropper and Null arrived at the scene, Men-denhall simply left, without offering any statement concerning the events of the day.[9] His sudden absence from the scene *233 of a homicide, without any explanation, warranted further inquiry in the minds of lead investigators.
When investigating officers began to inquire of the officers on the scene as to the morning’s events, Deputy Ashley reported speaking with two witnesses.[10] It appears that Ashley, being one of the first officers to arrive after the shooting, began a canvass of the immediate area in an attempt to obtain witness statements and any other relevant evidence. In so doing, he spoke with two witnesses who refused to give their names, but who affirmatively identified Mendenhall as the shooter.[11]
Somewhat later in the day, at the hospital where Grisby was receiving treatment, Ashley overheard what would be the third witness he reported identify Mendenhall as the shooter. Deputy Cropper received this reported identification not only from Ashley, but also from Deputy Newton, who while present at the hospital complied with Ashley’s request to question the woman. Newton was selected, apparently, as he was more familiar with the residents in the relevant neighborhood. When Newton questioned this witness, whom he identified as Pamela Neal, as to the events she observed that morning, Newton reported, *234 consistent with Ashley’s report, that Neal identified Mendenhall as the shooter.
In an attempt to follow-up with Pamela Neal, who is also Deon Grisby’s half-sister, deputies went to the home she shared with her Mother, Gertie, located at the scene of the shooting, approximately sixty feet from where Myles body lay in. the street. Officer Jimmy Morgan, assisting with the investigation, accompanied Deputy Null to the Neals’ home that afternoon.[12]- He questioned the Neals as to the events they witnessed earlier that day. He maintains that Gertie and her daughter both reported seeing Myles running down the street, weapon in hand, followed by John Menden-hall, also bearing arms. They then reported hearing shots fired, and when they looked next, having apparently ducked in fear, they saw Myles fall to the ground. They further observed Mendenhall, weapon in hand, either standing somewhere near the slain body or near his vehicle. It was obvious at that time that Myles fell victim to the gunfire they had just heard. The Neals further stated no one else with a weapon was anywhere in the area. Sometime during this visit, Pamela Neal executed a written statement as to the day’s events.[13]
In deposition testimony concerning these events, Pamela Neal asserts that she never, in fact, identified John Mendenhall as the shooter, and she asserts her mother did not witness events nor answer questions concerning these events, as the deputies maintain.[14] Specifically, she recalls discussing the day’s events with Deputy Newton at the hospital, and specifically recalls informing Newton that another man — not Mendenhall — who apparently was driving a green car, shot Myles. She claims, in her deposition testimony, that she was unaware of this individual’s identity at that time, and did not provide a name to Newton.[15] In fact, she denies ever identifying Mendenhall as the shooter, thus disputing Ashley’s claim of overhearing her make just such a statement. We address the consequences of this factual dispute below.
*235 Further evidence gathered that day concerning the suspected murder weapon. Specifically, officers at the scene recovered two spent nine-millimeter shell casings, despite finding no nine-millimeter weapon anywhere near the body. Inquiry by Deputy Null into whether Mendenhall possessed a weapon of that caliber revealed that Officer Todd Moore previously performed some repair work on a Tec-9 handgun, a nine-millimeter weapon, that belonged to John Mendenhall.
In an attempt to obtain Mendenhall’s version of events, Deputy Newton paid a visit to Mendenhall, at his residence. In response to inquires as to the day’s events, Mendenhall reported to Newton that he came upon Officer White at the scene of Grisby’s shooting and subsequently left in pursuit of the shooter. He said he chambered a round in his handgun — not his nine-millimeter weapon but a smaller caliber handgun he carried — but it jammed. He then refused further comment. Newton alerted Mendenhall that Cropper and Null, the investigating officers, wished to discuss the matter directly with him, and that he should report to the police station with all his weapons. Mendenhall apparently replied that he might make an appearance.
Later that day, Mendenhall did report to the station house. Prior to initiating the inquiry, Cropper read, and requested Mendenhall acknowledge by initialing, his Miranda[16] rights. Cropper then proceeded to question Mendenhall concerning the shooting, beginning with questions as to whether Mendenhall possessed a nine-millimeter weapon. Mendenhall apparently answered those initial questions, but as soon as the interview focused more intently on the morning’s events, Mendenhall refused to provide additional information. Mendenhall maintains that his silence came in response to, and out of shock at, having been read his rights. He did nothing more, he now claims, than assert those rights as he understood them.
We pause in our factual recitation to quickly note that Mendenhall’s purported motivation in refusing to answer questions is irrelevant. The indisputable fact, for summary judgment purposes, is his refusal and his subsequent departure from the station house shortly thereafter.[17]
Deputy Null followed Mendenhall, in an attempt to convince Mendenhall to talk. Mendenhall refused, saying only that if the deputies could exercise patience until Monday, he would provide them with all relevant evidence concerning the shooting.
After this failed attempt to secure Men-denhall’s cooperation, Deputy Cropper sought and obtained the arrest and search warrants.[18] Mendenhall was arrested later that evening.
*236 Upon careful consideration of the above facts, and after an exhaustive review of the summary judgment record in this case, we find, as a matter of law, that a reasonable officer in Deputy Cropper’s position could believe probable cause existed to arrest Mendenhall for the murder of William Myles. Even after drawing all available inferences in Mendenhall’s favor, we are compelled by the facts to so hold.
Our exhaustive review of the record reveals one significant dispute with respect to the relevant facts: the identification provided by Pamela Neal. As we must, we view this factual dispute in the light most favorable to Mendenhall. The dispute can be briefly summarized: Ashley maintains that he overheard Neal identify Menden-hall as the shooter; Newton, Null and Morgan maintain that Neal made the same identification in response to inquiries; Neal maintains that she identified a different man.
Even if Neal is correct, and Null and Newton now mis-state her identification, we find this dispute to be immaterial to the inquiry now before us — whether a reasonable officer could have believed probable cause existed to arrest Mendenhall.
As we emphasized earlier, probable cause analysis requires us to look to the totality of the circumstances to determine whether the officers in this case behaved reasonably. Neal executed a handwritten statement placing Mendenhall at the scene with a weapon. Her statement made no indication of another as responsible for the shooting death of Myles. In fact, her statement omits entirely any reference to another party at the scene with a weapon. Even if, as she asserts, she informed Newton, in response to questioning, that the man in the green car committed the shooting, and even if she later repeated this statement to Null and Morgan, a reasonable officer — affording these statements appropriate weight in the probable cause analysis, reading them in conjunction with her handwritten statement which excluded any reference to this other man, and considering the totality of the remaining evidence pointing to Mendenhall as the shooter — could still conclude probable cause to arrest existed.
The undisputed facts, simply summarized, and disregarding the controversial identification from Pamela Neal, are: investigating deputies spoke with two witnesses who affirmatively identified Men-denhall as the shooter; another witness, Pamela Neal in her handwritten statement, placed Mendenhall at the scene with a weapon; medical personnel reported Mendenhall’s uncanny knowledge of the wound and Mendenhall’s eagerness to finger evidence relating to a homicide; investigating deputies obtained two spent nine-millimeter shell casings from the scene, and later became aware that Mendenhall possessed such a caliber weapon; and Mendenhall refused to cooperate or answer questions concerning the killing. Under such a factual scenario, we simply cannot conclude that it was unreasonable for an officer to believe he had probable *237 cause to arrest John Mendenhall.[19]
III. CONCLUSION
Mendenhall was at the scene of a homicide, holding a weapon. He was identified as the shooter and was known to be in possession of a weapon that matched the suspected murder device. He fled the scene when investigators arrived, and he subsequently refused to answer questions. His arrest was reasonable, as it was based on arguable probable cause and a civil action for damages under § 1983 cannot be maintained on these facts. It matters not for the purposes of this analysis that a later hearing, aided by the confession of another individual, resulted in Menden-hall’s release from custody and bail. “The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)). As such, we REVERSE the order of the district court denying qualified immunity and REMAND to the district court for dismissal of the claims asserted by Mendenhall pursuant to 42 U.S.C. § 1983 and for such other proceedings that are not inconsistent with this opinion.
REVERSE and REMAND.

. John Mendenhall served as a deputy sheriff in Webster Parish for several years prior to the events that give rise to this dispute. His tenure apparently ended upon the swearing in of appellant Sheriff Riser in June of 1996. Sheriff Riser, as he stated in depositions taken in relation to this lawsuit, apparently dismissed Mendenhall out of concern for his criminal record. Following his dismissal in Webster Parish, Mendenhall secured employment as a police officer in Haynesville, in neighboring Claiborne Parish, although he maintained his residence in Cullen, Webster Parish.

. The dissent expresses confusion concerning the nature and extent of the ensuing investiga *229 tion, implying, in fact, that little investigation occurred at all. Our reading of the record reveals an extensive investigation on the day of the murder, including: an on scene investigation of the crime, involving a full canvass of the neighborhood for any potential witnesses; further investigation at the hospital, where the victim of the first shooting was recovering; the questioning of witnesses identified at the hospital; follow-up investigation of the murder weapon, in an effort to determine whether Mendenhall owned a similar caliber weapon; later investigation at the scene, including follow-up interviews with eyewitnesses; a visit to Mendenhall’s home, at which time his cooperation was requested; and an attempted interview with Mendenhall at the station house.

. LSA-C.Cr.P. Art.296.

. Officer Cropper’s affidavit in support of the arrest warrant stated in relevant part:
[To the best of my knowledge and belief], John Mendenhall ... did commit in the following manner an offense contrary to law by chasing a black/male by the name of William D. Myles, down Lee St. Cullen, Louisiana, armed with a 9mm piston, then firing the 9mm piston, striking William D. Miles in the back of the head, causing death. After shooting William D. Myles put [sic] the 9mm pistol back into his vehicle, then leave [sic] the scene, before talking to Investigating Officers. John Mendenhall had specific intent to inflict bodily harm. Therefore violating LRS 14:30.1 Second Degree Murder.

. We pause to note that we need not and in fact do not decide today whether probable cause on the facts of this case actually existed at the time of arrest.

. Cropper, the lead investigating officer, concluded from this information that a crime had been committed, rather than a justifiable homicide in self-defense or in the Iine-of-duty. Mendenhall asserts that the shooting of Myles was, in fact, justified, as Myles was fleeing from a botched kidnaping in which another was shot and left for dead, and as he fled, he apparently fired his weapon into the air. Our independent review of the record indicates that on the day of the shooting the officers behaved reasonably in pursing the investigation as an inquiry into a suspected homicide.

. In fact, Wayne Walsh, a trained emergency medical technician, could not determine the nature of the injury until the body was "rolled.”

. While the dissent asserts that "the summary judgment record does not establish that, as a police officer faced with stressful, violent and chaotic circumstances, Mendenhall’s conduct was unusual, let alone suspicious,” our reading of Mendenhall’s own deposition testimony supports the alternative position that even Mendenhall knew his behavior was anything but standard:
Q: Had anybody moved the body at this point?
M: No. The body was never moved.
Q: Why not? Why didn’t somebody move the body to see where he was wounded?
M: They didn’t want to touch him.
Q: Why no?
M: Like I said, I thought we was making enough boo-boo’s as it is. Why, you know, you're not supposed to touch him until the coroner get there. That’s one thing I do know.
Q: Now, you acknowledge that you made some errors in picking up the gun and checking the empty shells?
M: Yes, sir.
Q: And that you probably should have, on second thought, not given Ted the ability to leave?
M: Yes, second thought, yeah.

.The dissent reads this fact as reflecting poorly on the officers' investigative skills; essentially as a failure on the part of investigators to obtain Mendenhall’s version of events at the scene. However, our careful review of the record reveals that, in fact, Mendenhall departed while Ashley was securing the area and speaking with witnesses and Shaw was on the phone seeking assistance from superi- or officers. Mendenhall, thus, left the scene before officers had an opportunity to question him. Despite the dissent's insinuation that *233 Mendenhall had no reason to cooperate, he was not, at this time, a suspect It was his voluntary, premature exit from the scene, before he could even be asked about the day’s events, that led investigators to first question his role in Myles' shooting death.

. It should be noted Deputy Ashley is not a party-defendant to this lawsuit.

. The dissent maintains that Deputy Ashley’s testimony actually reveals that neither witness ever said they saw Mendenhall shoot. A closer and more complete reading of Ashley’s testimony, however, reveals that he was only trying to clarify those witness' statements, not withdraw his testimony that they had identified Mendenhall:
Q: Okay. That they didn’t actually see him shoot, but he was out there with a gun? A: Correct.
Q: Okay.
A: Didn’t actually see him pull the trigger.
Q: But, the essential stuff that they saw the guy get shot, John was the only guy they saw with a gun in his hand ...
A: Chasing him.
Q: ... but, that they didn’t see him shoot the guy?
A: Actually pull the trigger.
Q: Right.
A: Correct.
Thus, the dissent’s efforts to impeach Ashley by implying that he withdraws his testimony concerning the two witnesses is not borne out by the record. Rather, Ashley simply clarified his testimony, under questioning, to be clear that the witnesses never actually saw Mendenhall pull the trigger — understandable, given the frightening nature of the scene witnessed. This in no way undermines the reliability of the report he produced immediately following his investigation, in which he stated that “two of [the witnesses] said that John Mendenhall had shot the deceased in the head.” In fact, the dissent's general attempt to discredit this report and subsequent testimony is undermined by the very fact that Ashley filed his written report, complete with references to these witnesses, on the day of the incident and testified consistent with this report in his deposition testimony taken months later, in conjunction with this lawsuit.
Further, the dissent’s additional attempt to discredit Ashley’s report of these two witnesses by referencing ten witnesses supposedly interviewed by Cropper at the scene of the crime, who were supposedly unable to testify that Mendenhall shot Myles, is factually incorrect and misstates the record. In the first instance, Cropper testified that he did not, in fact, successfully interview witnesses at the scene. Rather, Ashley and Null canvassed the area, while Cropper’s minor efforts to speak with local residents were generally met with resistance. Thus, when Cropper referenced ten witnesses to these events during the Preliminary Examination, he was referring to witnesses generally, not simply eyewitnesses to the shooting. His deposition testimony further reveals that some of them were, in fact, interviewed after the arrest (thus, they are not relevant to the matter before this Court today.) Further, two of the ten witnesses mentioned by the dissent and referred to by Cropper as supporting probable cause were, in fact, the two witnesses interviewed and reported by Ashley. Thus, the dissent's assertion that "Cropper, who arrived soon after Ashley, interviewed approximately ten witnesses, all of whom apparently provided him their names,” does nothing to undermine Ashley’s report that the witnesses were reluctant to cooperate, as, in fact, it misstates the record and Cropper’s role in interviewing witnesses.

. Appellee Mendenhall attempts to argue in his brief that Null met with Neal on two separate occasions on the day of Myles’ shooting, and that this is somehow relevant to the outcome of this appeal. Specifically, appellee urges us to consider Null's purported deception in denying meeting with Neal a second time. Our review of the record indicates, however, that Null and Neal met only once on September 13, 1996. While Null and Neal appear to differ somewhat as to the time of this meeting — Neal remembers the meeting occurring in the afternoon, while Null is less clear as to the time — there is no summary judgment evidence that this second meeting ever took place. Any argument offered by appellee concerning why certain questions were not asked by Null at this second meeting, therefore, cannot be considered by this Court, as there was no second meeting at which Null could have engaged in this inquiry-

. Deputy Null apparently requested Pamela Neal’s statement concerning the events of that morning. In response to this inquiry, Neal wrote and acknowledged the following statement: "Around 7:30 this morning I looked out of my front door. A man was running down the street with a gun in his hand and shooting up in the air. John Mendenhall was up the street in his truck. The man ran passed [sic] John, and John yelled at him to stop. The man jumped a ditch turned around shot up in the air. I ducked. When I looked up the man was hitting the ground. And John was standing by his truck with a gun in his hand.”

. Pamela Neal states in her deposition that her mother only witnessed Myles falling to the ground. Her mother confirms this version of events in her deposition testimony, to the effect that upon hearing gunfire, and rushing to the door, she witnessed the victim falling to the ground, and nothing further. She further confirms that her daughter, in speaking to Deputy Null that afternoon at their home, did not identify Mendenhall as the shooter, although it is difficult to gauge from her testimony the extent of her knowledge of the exchange between her daughter and Null.

. It should be noted that Neal admits in her deposition testimony that she was aware of the identification of this man — Ted Nellams— but, as she was dating Nellams at the time of the incident, she asserts she identified him only by virtue of the automobile he was then driving, out of fear of the police.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The dissent describes the failure of investigators to obtain Mendenhall and Officer White’s version of events as the biggest missing piece in the probable cause puzzle. However, both men were interviewed and presented with ample opportunity — at the scene, and later — to provide their understanding of the day’s events. Mendenhall himself testified that he allowed Ted Nellams to leave the scene of the crime because he planned to remain behind, in order to relate the manner of the shooting to investigators — something he then failed to do.

. The dissent acknowledges that the officers were justified in seeking a search warrant for Mendenhall’s nine-millimeter pistol, but posits that they should have done so first, prior to arrest, in order to conduct ballistics tests. While professional courtesy, as we imagine is extended from one officer to the next, might point towards this approach, the officers were by no means required under the law to search first and arrest later. In fact, as the officers' testimony reveals, there was concern that evidence was being lost as every moment passed.
The law requires that the officers, in order to arrest, must have probable cause just as they would need in order to search. In this case, the requisite probable cause appears to be coterminous. Simply stated, a warrant to search for Mendenhall's gun would have required probable cause to believe that the weapon to be searched for was evidence of a crime. The only applicable crime on these facts is murder. Our case law, following the *236 Supreme Court, makes clear that probable cause to search is no different than probable cause to arrest. See United States v. Brouillette, 478 F.2d 1171, 1177 (5th Cir.l973)('Tl is well recognized that the probable cause required to justify a search warrant is coextensive with the probable cause required to justify an arrest warrant.”) The dissent states: ''CT]wo spent nine-millimeter shell casings were found at the scene and ... Mendenhall was thought to have had a nine-millimeter pistol. This information would have justified the officers in seeking a search warrant for Mendenhall’s pistol.” Certainly the dissent does not mean to imply that probable cause exits, on these facts to search the home of every individual in the community known to possess a nine-millimeter weapon. The only conclusion to be drawn from this statement is that the presence of the shell casings, coupled with Mendenhall’s actions that morning, gave the officers probable cause. We simply fail to see how the officers could have had probable cause to search for a suspected murder weapon owned by Mendenhall, as the dissent maintains, but not probable cause to arrest Mendenhall for murder, under the unique facts of this case.

. Because we find the officers in this case behaved reasonably, and are thus entitled to qualified immunity, we need not reach the argument advanced by appellants concerning the related offense doctrine.