IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————————

No. 99-41297

———————————————————

JAMES YORK BROWN,

Plaintiff-Appellant,

versus

ROLAND SCOTT LYFORD; ET AL.,

Defendants,

ROLAND SCOTT LYFORD; ANN GOAR; DEBBIE MINSHEW; BROOKS FLEIG; STEVE BAGGS; UPSHUR COUNTY, TEXAS,

Defendants-Appellees.

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas

———————————————————

February 20, 2001

Before KING, Chief Judge, and HIGGINBOTHAM and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an appeal from a judgment of the district court granting summary judgment to various defendants in a section 1983 lawsuit. This suit arose from an aborted criminal investigation of child abuse and murder, presenting claims against arresting officials including malicious prosecution and false arrest. We hold that the officer defendants were entitled to qualified immunity, and that none was a policymaking official for the county defendant. We AFFIRM the judgment of the district court.

1

I

In 1990, Ann Goar and Debbie Minshew as employees of the Texas Department of Protective and Regulatory Services were assigned to counsel the children of Loretta and Wendell Kerr. The Kerr children came into foster care upon allegations of sexual abuse leveled against Wendell Kerr. The counseling later expanded to include the children of Wanda Geer Hicks, whom Wendell Kerr had started dating. The Kerr and Hicks children began to tell of being tortured, molested, and sodomized by their parents, grandparents, and various strangers, abuse including satanic rituals involving masks and knives. Their stories related the murder, dismemberment, post-mortem rape, and cannibalism of babies and children by the abusing adults. Goar and Minshew recruited two private occult investigators, Brooks Fleig and Steve Baggs to assist in an investigation of these accounts by the children. Roland Scott Lyford was appointed prosecutor pro tem after Upshur County's regular district attorney recused himself from the case. Lyford participated closely in the investigation, and in 1993 at Lyford's recommendation the county hired Fleig and Baggs as criminal investigators.

Child Protective Services criticized the methods of the investigators in interviewing the Kerr and Hicks children. CPS particularly criticized the use of a "holding technique," in which investigators physically restrained children while they answered

2

questions. CPS also objected to the suggestive nature of the questions asked by the investigators. Suggestive questions were asked of both the children and the adult witnesses. An adult, Wanda Hicks,[1] later recanted, explaining that she developed her story out of the questions investigators put to her. Despite a grand jury indictment, all charges were ultimately dropped. Wendell Kerr had a corroborated alibi for the times of the alleged crimes, and the mishandling of the child witnesses made their testimony unreliable.

Yet, evidence also pointed in the opposite direction. Medical examination of the children found genital and anal scarring consistent with sexual molestation. An adult, Lucas Geer, confessed to police that he participated in ritualistic child abuse and child murder, a confession corroborating the stories told by the Kerr and Hicks children. A search of the Kerr property found three shallow grave-like depressions in the soil, a shovel with blood residue on it, an area matching the children's description of where the abuses occurred, two devil masks, a blood-stained mattress cover, and four knives said by the children to have been used to murder and dismember children. Pursuant to a plea agreement, two of the charged adults identified items retrieved from the Kerr household as devices used to restrain and torture children. Finally, plastic bags were found buried on the Kerr

---

[1] Then named Wanda Kerr due to her marriage.

3

property, containing bone fragments. Before Lyford took his evidence to the grand jury, the Texas Human Skeletal Identification Laboratory issued a report stating the remains were most probably human. Another report from a different laboratory, filed months after the indictment was issued, concluded that the remains were not human.

While the defendants were investigating the Kerr case, Sergeant James Brown was investigating the disappearance of Kelly Wilson. Wilson was 17 when she was reported missing in Gilmer, Texas. In 1993, one of the Kerr children, identified as "R.S.," claimed that Kelly Wilson had been abducted, raped, and murdered by the Kerrs. As a result, Brown's investigation began to overlap with the investigation being conducted by defendants.

In a conversation between Brown and defendants, Brown said he had separately investigated the Kerr and Hicks children's allegations, and observed that Wendell Kerr, a key suspect, was not in Texas when Kelly Wilson disappeared. Brown asserts that defendants viewed his comments as interfering with their investigation. Lyford told Brown that Lyford was now investigating the disappearance of Kelly Wilson, that he did not want Brown interfering, and that if Brown interfered, "we're going to have a problem."

Shortly thereafter, R.S. implicated Brown in the charges of child abuse and the disappearance of Kelly Wilson. He stated that the police would not help, that they were also "bad," and described

4

in general terms a person resembling Brown as having participated in the abuse.  Later, Connie Martin – one of the adults involved – also implicated Brown by name.  At the same time, the case against Brown had problems.  Wanda Kerr was unable to identify Brown in a photo lineup.  The narratives told by witnesses other than R.S. never mentioned Brown.

Lyford took this evidence to the Upshur County Grand Jury, which indicted the alleged abusers, including Brown.  Brown was arrested and spent six days in jail. As we explained, charges were later dropped.  Considerable media coverage surrounded these events.  The Kerrs sued under section 1983.  The district court dismissed on immunity grounds.  We affirmed in *Kerr v. Lyford*.[2] This case concerns largely the same events, but is Brown's lawsuit rather than the Kerrs's.  In his original complaint, Brown asserted a broad range of constitutional violations,[3] as well as a variety of state law claims.[4]  In rendering judgment, the district court read Brown's complaint to invoke federal constitutional rights to

---

[2] 171 F.3d 330 (5th Cir. 1999).

[3] Specifically, Brown claimed to have been deprived of the the right not to be falsely accused of capital murder, the right not to be falsely arrested, the right not to be subjected to unlawful searches and seizures, the right not to be deprived of liberty without due process of law, the right not to be deprived of property without due process of law, the right of equal protection of law, and the right of privacy.

[4] Those were malicious prosecution, intentional infliction of emotional distress, negligence, gross negligence, and civil conspiracy.

be free from unreasonable seizure, false arrest, false imprisonment, and malicious prosecution, a reading Brown does not challenge. The district court held that Goar, Minshew, Fleig, and Baggs were entitled to qualified immunity, Lyford to absolute immunity, and all were entitled to summary judgment. It granted summary judgment to Upshur County. Brown appeals.

## II

To overcome the qualified immunity of government officials, Brown must show 1) a constitutional violation; 2) of a right clearly established at the time the violation occurred; and 3) that the defendant actually engaged in conduct that violated the clearly established right.[5]

To date, the Fifth Circuit accepts that malicious prosecution can deprive a person of constitutional rights. This "constitutional tort" has seven elements:

1.  criminal action commenced against the plaintiffs;

2.  that the prosecution was caused by the defendants or with their aid;

3.  that the action terminated in the plaintiffs' favor;

4.  that the plaintiffs were innocent;

5.  that the defendants acted without probable cause;

---

[5] *Kerr*, 171 F.3d at 339.

6. that the defendants acted with malice; and

7. that the criminal proceeding damaged the plaintiffs.[6]

The "constitutional torts" of false arrest, unreasonable seizure, and false imprisonment also require a showing of no probable cause.[7]

These defendants have qualified immunity if they had probable cause to believe that Brown committed a crime. "For purposes of malicious prosecution, probable cause means 'the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted.'"[8]

Brown points to the statements of three witnesses in the summary judgment record as establishing the absence of probable cause. First, Shane Phelps, the assistant Attorney General who took over from Lyford, stated in an affidavit that "the evidence

---

[6] *Kerr*, 171 F.3d at 340.

[7] *See, e.g., Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (holding that qualified immunity protects government officials from a charge of wrongful arrest where a reasonable official would believe probable cause was present); *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988) ("Claims of false arrest, false imprisonment, and malicious prosecution involve the guarantees of the fourth and fourteenth amendments when the individual complains of an arrest, detention, and prosecution without probable cause.").

[8] *Kerr*, 171 F.3d at 340 (quoting *Moore v. McDonald*, 30 F.3d 616, 620 n.2 (5th Cir. 1994)).

supporting the indictment of Sgt. Brown was fatally deficient and did not even rise to the level of probable cause." Second, Dr. Richard Ault, an expert retained by Brown, expressed in an affidavit his opinion that the methods used in interviewing the various witnesses were excessively coercive, such that the statements of those witness could not "produce objective information that a reasonable law enforcement officer could use in the course of" an investigation. Third, Dr. Bruce Perry, an expert testifying as part of a later grand jury investigation reviewing Lyford's investigation, said that both the adult and child witnesses came from abusive homes and were therefore prone to reading a questioner's face and saying what they thought the questioner wanted to hear, in order to protect themselves from abuse. Perry also expressed his opinion that the interviewing techniques used were highly coercive and suggestive.

A plaintiff must clear a significant hurdle to defeat qualified immunity. "[T]here must not even 'arguably' be probable cause for the search and arrest for immunity to be lost."[9] That is, if a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply. Defendants point to the following evidence

---

[9] *Hart v. O'Brien*, 127 F.3d 424, 444 (5th Cir. 1997). *Hart* was abrogated by the Supreme Court's decision in *Kalina v. Fletcher*, 522 U.S. 118 (1997), but upon a different issue. *Kalina* extended the time during which a prosecutor is absolutely immunized beyond the time recognized in *Hart*.

8

that, at least arguably, established probable cause to arrest Brown. First, R.S. implicated Brown in the disappearance of Kelly Wilson. Second, Paulette Kerr stated she was afraid of Brown and that Brown had been dating Kelly Wilson. Third, Connie Martin implicated Brown in the disappearance of Kelly Wilson and the abuse of the Kerr children. Fourth, these witnesses were credible because their stories were consistent with one another and because physical evidence from the bodies of the Kerr children and the Kerr property tended to support their stories. Fifth, Brown's investigation of the Wilson disappearance contained suspicious irregularities.

We cannot say that the testimony of several eyewitnesses, corroborated in some aspects by physical evidence, did not even arguably create probable cause. Qualified immunity "gives ample room for mistaken judgements," by protecting "all but the plainly incompetent or those who knowingly violate the law."[10] That is the balance that courts have struck between compensating wronged individuals for deprivation of constitutional rights and frustrating officials in discharging their duties for fear of personal liability.[11] While Doctors Ault and Perry raise doubts as to the credibility of the witnesses in this case, we cannot say that all reasonable officers should have seen in these witnesses

---

[10] *See Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

[11] *See Shipp v. McMahon*, 234 F.3d 907, 915 (5th Cir. 2000).

9

the psychological tendency to confabulate that Ault and Perry saw, nor can we say that all reasonable officers should have understood these interviews to be so coercive that the matter should not have been taken to a grand jury. This is especially true where, as here, aspects of those statements were corroborated by physical evidence. We agree with the district court that defendants Goar, Minshew, Flieg, and Baggs are entitled to qualified immunity.

### III

The district court granted Lyford summary judgment on the grounds that he was absolutely immune from suit as a prosecutor. Brown contests this reasoning, arguing that Lyford engaged in actionable investigative activities before donning his "prosecutor's hat." The circuits are divided on the proper approach to this situation.[12] We need not confront that dispute in this case. The judgment of the district court should be affirmed if Lyford was, like the other defendants and as he urges to us also, entitled to qualified immunity.[13]

---

[12] *Compare Buckley v. Fitzsimmons*, 20 F.3d 789, 796 (7th Cir. 1994) (holding that merely collecting false evidence is not independently actionable, and the use of such evidence is protected by absolute immunity), *with Zahrey v. Coffey*, 221 F.3d 342, 349-55 (2d Cir. 2000) (holding that where the same prosecutor collects false information and uses it to procure an indictment, the indictment cannot sever the causal chain and protect the prosecutor from liability for his investigatory acts).

[13] *See United States v. Real Prop. Located at 14301 Gateway Blvd. West, El Paso County, Texas,* 123 F.3d 312, 313 (5th Cir. 1997) ("It is well-settled, however, that we will not reverse a judgment of the district court if it can be affirmed on any ground,

We may properly determine whether Lyford is entitled to qualified immunity.[14] When faced with similar situations, we have remanded to the district court for a determination of qualified immunity.[15] In this case, however, we have the benefit of the district court's determinations as to defendants Goar, Minshew, Fleig, and Baggs, and the accusations against Lyford track the accusations against those four defendants. Since qualified immunity is immunity not only from damages but also from suit itself, it is to be determined as early as possible.[16] It makes little sense to remand this issue to the district court, because the outcome is foreordained. The district court has already held that Goar, Minshew, Fleig, and Baggs are entitled to qualified

_____

regardless of whether the district court articulated the ground.").

[14] *See Buckley*, 20 F.3d at 793 ("Although qualified immunity is an affirmative defense . . . no principle forbids a court to notice that such a defense exists, is bound to be raised, and is certain to succeed when raised. So much is established for res judicata and the statute of limitations, two other affirmative defenses. . . . Defendants inform us that they want the benefit of qualified immunity. Because this is a legal defense, we would not defer to the district court's resolution. Courts should resolve immunity issues at the earliest possible time, preferably before allowing discovery. . . . That time is now.").

[15] *See Galvan v. Garmon*, 710 F.2d 214, 215 (5th Cir. 1983) (holding that a probation officer was not entitled to absolute immunity, and remanding for consideration of qualified immunity); *Ryland v. Shapiro*, 708 F.2d 967, 975-76 (5th Cir. 1983) (holding that charges made against prosecutors were outside the scope of their prosecutorial role and absolute immunity therefore did not apply; remanding for consideration of qualified immunity).

[16] *See Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995); *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

11

immunity.

As to his conduct before the grand jury, Lyford was entitled to absolute immunity. As to his investigatory conduct leading to the grand jury, he was entitled to the same qualified immunity that protects Goar, Minshew, Flieg, and Baggs. Lyford is situated similarly to Goar, Minshew, Flieg, and Baggs, except that he was the person who brought the case before the grand jury -- an act for which he receives absolute immunity. Lyford was therefore entitled to qualified immunity for his investigative acts. Accordingly, the judgment of the district court as to Lyford is AFFIRMED.

IV

Plaintiff also sued Upshur County, seeking to hold it liable for the conduct of Fleig and Lyford. Under *Monell v. Department of Social Services*,[17] a county cannot be held liable under section 1983 on a theory of respondeat superior, but it can be held liable when conduct depriving a person of constitutional rights was pursuant to county policy. Brown does not contend that, apart from the role of Lyford, Upshur County had a policy of charging and arresting innocent people. Rather he urges that Lyford acted as a policymaking official. We disagree, and hold Lyford was not a

---

[17] 436 U.S. 658, 694 (1978).

policymaking official for Upshur County.[18]

Brown argues that the elected district attorney is a policymaking official and Lyford as prosecutor pro tem in this case held all the rights and duties of the elected district attorney.[19] Brown concedes that under *Esteves v. Brock*,[20] Lyford was not a policymaking official for Upshur County when he was acting in his prosecutorial capacity, because then he was enforcing state rather than county law. Brown seeks to invoke the exception in *Esteves*, permitting *Monell* liability for those duties of a prosecutor that are administrative or managerial in nature. Brown misunderstands the holding of *Esteves*.

*Esteves* is clear that a county may only be held liable for acts of a district attorney when he "functions as a final policymaker for the county."[21] Thus, for example, a district

---

[18] The district court held that because Fleig and Lyford were immune, Upshur County was also not subject to suit, citing *City of Los Angeles v. Heller*, 475 U.S. 796 , 799 (1986). *Heller*, however, held only that if no claim is stated against officials–if plaintiff does not show any violation of his constitutional rights–then there exists no liability to pass through to the county. When, however, a plaintiff states a claim but the official is protected by qualified immunity, that defense protects only the individual officer, not the municipality. *See, e.g, Babb v. Dorman*, 33 F.3d 472, 475 n.5 (5th Cir. 1994). Accordingly, we must reach the question of whether Lyford was a policymaking official for Upshur County.

[19] Brown does not argue that Fleig was a policymaking official for Upshur County, and we put him aside.

[20] 106 F.3d 674 (5th Cir. 1997).

[21] 106 F.3d at 678.

13

attorney with the final word on hiring or firing within the district attorney's office sets county policy regarding those decisions. That can then support *Monell* liability for the county. Here, however, Brown has made no showing that Lyford in some way beyond his role as a prosecutor pro tem functioned as the final policymaking authority for Upshur County in the investigation of the Kerr and Hicks children's claims. Upshur County officials have testified that he did not, and there is no contrary evidence. The sole basis for the contention that Lyford set county policy in his investigative work was his status as prosecutor pro tem. But Lyford as prosecutor pro tem stepped only into the shoes of the elected district attorney for purposes of the case he was appointed to handle. He did not assume general management of the array of cases in that office. He was a one case prosecutor. While Lyford's authority over his one case was considerable, his charge was too limited to make him a policymaking authority for the county. His limited charge is made plain by the fact that he could not hire or fire for Upshur County. Indeed he could not hire Brooks and Flieg. He could only recommend that the County do so.

Brown has presented no evidence that Lyford had or exercised sufficient policymaking authority for Upshur County to warrant the imposition of *Monell* liability. The district court did not err in granting summary judgment to Upshur County.

V

14

The judgment of the district court is AFFIRMED.