United States Court of Appeals
Fifth Circuit

**F I L E D**

April 10, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

---

No. 05-30194

---

MICHAEL P. NANCE,

Plaintiff-Appellee,

versus

NEW ORLEANS AND BATON ROUGE STEAMSHIP PILOTS' ASSOCIATION,
ET AL.,

Defendants,

BOARD OF EXAMINERS FOR THE NEW ORLEANS AND BATON ROUGE STEAMSHIP
PILOTS; HENRY G. SHOWS, individually and in his capacity as a
member of the Board of Examiners; EDDIE DANIELS, individually and
in his capacity as a member of the Board of Examiners; DAVID
SHIRE, individually and in his capacity as a member of the Board
of Examiners,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
(2:03-CV-3092)

---

Before KING, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:[*]

This interlocutory appeal by members of the Board of Examiners
(Henry G. Shows, Eddie Daniels, and David Shirah (spelled "Shire"
in caption) (the Board)) for the New Orleans and Baton Rouge

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Steamship Pilots' Association (NOBRA) is from the denial of their absolute and qualified-immunity claims. **REVERSED and RENDERED**.

I.

A statutorily-created entity, NOBRA is charged with "pilot[ing] sea-going vessels from the port of New Orleans to 31° North Latitude and return including the port of Baton Rouge and intermediate ports". LA. REV. STAT. ANN. § 34:1043. Appointed by the Governor, with the advice and consent of the Senate, *id.* § 34:1042(A), the Board is required to "report immediately to the governor all cases of neglect of duty, habitual drunkenness, and gross violations of its rules"; the Governor may then request the Board to conduct an investigation and recommend a penalty. *Id.* § 34:1042(B).

On 18 April 2002, Michael Nance, a commissioned river pilot and NOBRA member, had a scheduled shift at the United States Coast Guard's Vessel Traffic Service Center (VTC) from 11:00 p.m. until 7:00 a.m. the following morning. Soon after arriving for his shift, and without permission to do so, Nance left. (Although his activities during his absence are disputed, he does *not* dispute being absent for almost his entire shift.)

On the morning of 19 April, following what would have been the end of his VTC shift, Nance went to NOBRA's office, where he and other river pilots were to inspect NOBRA's records. (This inspection was precipitated by accusations that one or more pilots

2

had posted private pilot records on the Internet.) Prior to the inspection, NOBRA's president asked Nance to take a Breathalyzer test; he wanted to determine whether Nance had consumed alcohol while on VTC duty. (When deposed, the president explained he had received a report that morning from another NOBRA pilot that Nance spent the prior night drinking.)

Nance refused to take the test before speaking with his attorney. Unable to reach his attorney that morning, Nance did not agree to take the test until after the test administrator had left NOBRA's offices; by then, too much time had passed for the test to be accurate.

Following an investigation by NOBRA, Nance was offered, and signed on 26 November 2002 (without a NOBRA-permitted hearing), a return-to-duty order. It was a proposed agreement in the nature of a plea bargain, providing: (1) Nance admitted to being absent from his VTC post and refusing to submit to the Breathalyzer test when requested; (2) the Board recommended concurrent one-year suspensions for each offense, reduced to six months because of Nance's "unblemished history as a pilot"; and (3) upon his return to duty, Nance was to serve a two-year probationary period, during which the Board could, after a hearing, require him to serve the remainder of his original suspension if further infractions occurred.

The Governor rejected the proposed agreement. A second agreement was reached: in part, for the probationary period, the Governor could determine Nance committed a violation warranting his serving the remainder of his suspension. Nance asserts he accepted this agreement under duress; he asserts he was told that, if he did not agree to it, he would lose his commission.

Rather than challenging the agreement pursuant to the process provided by state law, Nance filed this action, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, against NOBRA and the Board for violations of his due-process and equal-protection rights. NOBRA and the Board moved for summary judgment, claiming immunity.

The district court granted NOBRA summary judgment, concluding: Nance failed to state a claim under § 1983 because NOBRA and its officers played no role in investigating or punishing Nance; he failed to state an actionable § 1985(3) conspiracy claim; and, because he failed to do so, the related § 1986 claim failed. Regarding the Board, summary judgment was awarded against the §§ 1985 and 1986 claims; it was denied, however, for the § 1983 claims.

## II.

A summary-judgment decision is reviewed *de novo*. *Michalik v. Hermann*, 422 F.3d 252, 257 (5th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

4

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c); *see* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322-23 (1986). Summary-judgment evidence is viewed in the light most favorable to the non-movant, with all reasonable inferences drawn in his favor. **Minter v. Great Am. Ins. Co. of N.Y.**, 423 F.3d 460, 465 (5th Cir. 2005). In essence, the Board maintains its actions are protected by both absolute quasi-judicial immunity and qualified immunity. For the reasons that follow, the Board has qualified immunity; therefore, we need *not* address the other claimed immunity.

Qualified immunity is an affirmative defense. **Siegert v. Gilley**, 500 U.S. 226, 231 (1991). The immunity protects against "not only unwarranted liability, but [also] unwarranted demands customarily imposed upon those defending a long drawn out lawsuit". **Id.** at 232. To achieve these goals, it should be raised as early as possible in the litigation. **Brown v. Lyford**, 243 F.3d 185, 191 (5th Cir.), *cert. denied*, 534 U.S. 817 (2001). The plaintiff has the burden of overcoming a qualified-immunity defense. **Atteberry v. Nocona Gen. Hosp.**, 430 F.3d 245, 253 (5th Cir. 2005).

We normally lack jurisdiction to review a summary-judgment denial because it is *not* a final, appealable order. **Michalik**, 422 F.3d at 257. An appeal from the denial of qualified immunity claimed through a summary judgment motion may fall, however, under

5

the collateral-order doctrine. *Id.* (noting "a small class of interlocutory orders that (1) conclusively determine, (2) important issues, which are separate from the merits of the action, and (3) which would be effectively unreviewable on appeal from a final judgment, are deemed 'final' for the purposes of appeal") (internal quotation marks omitted). Under this doctrine, if the appeal "turns on an issue of law", we have jurisdiction to review the denial. *Id.; Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (concluding an appeal from the qualified-immunity denial meets each of the collateral-order doctrine's requirements).

For summary-judgment purposes, "[a] factual dispute is 'genuine' [if] a reasonable party could return a verdict for the nonmoving party". *Lukan v. N. Forest ISD*, 183 F.3d 342, 345 (5th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000). If the qualified-immunity denial is based on *genuine* issues of material fact, we lack jurisdiction. *See Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001) ("[W]e have jurisdiction for this interlocutory appeal *if* it challenges the *materiality* of factual issues, but lack jurisdiction *if* it challenges the district court's *genuineness* ruling — that *genuine issues* exist concerning *material facts*".) (emphasis in original); *see also Reyes v. City of Richmond*, 287 F.3d 346, 351 (5th Cir. 2002) (explaining a "challenge [to] the genuineness, rather than the materiality, of the factual disputes ... is not reviewable by interlocutory appeal").

6

It appears the district court based its qualified-immunity denial on the equal-protection, *not* the due-process, claim. It also appears, however, that the court did *not* undertake the mandatory first-step analysis for qualified-immunity *vel non* (violation of constitutional right) and based the denial on step two (objective reasonableness). It concluded: "[T]here are *material* issues of fact as to whether the [Board's] actions were *objectively reasonable* .... *Unequal treatment for the same misconduct*, if proved, would present a serious jury issue". **Nance v. New Orleans & Baton Rouge S.S. Pilots Ass'n**, No. 03-3092, slip op. at 10 (E.D. La. 13 Jan. 2005) (unpublished) (emphasis added).

## A.

The collateral-order doctrine is appropriate for this interlocutory appeal because qualified immunity *vel non* against Nance's due-process and equal-protection claims "turns on an issue of law": step one of qualified-immunity analysis. **Michalik**, 422 F.3d at 257. Restated, whether Nance shows a clearly-established constitutional claim under current law, as discussed *infra*, is a "purely legal question". **Siegert**, 500 U.S. at 232.

We are *not* to "assume[], without deciding," that an alleged violation satisfies step one. **Id.** at 234. "This must be the initial inquiry." **Saucier v. Katz**, 533 U.S. 194, 201 (2001). For the two-step qualified-immunity analysis, we must first determine whether, *under current law*, "'a constitutional right would have

7

been violated on the facts alleged'". *McClendon v. City of Columbia*, 305 F.3d 314, 322-23 (5th Cir. 2002) (en banc) (quoting *Saucier*, 533 U.S. at 200), *cert. denied*, 537 U.S. 1232 (2003). (In determining whether, under current law, a clearly-established constitutional right was violated in a particular case, "a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established". *Saucier*, 533 U.S. at 201.) Second, even if such a right was violated, the official remains protected by "qualified immunity if his conduct was objectively reasonable" in the light of *then clearly-established law*. *Lukan*, 183 F.3d at 346.

B.

The material examined at step one differs, of course, depending on whether we are addressing a motion to dismiss or for summary judgment. For the former, we examine "the defendant's conduct *as alleged in the complaint*". *McClendon*, 305 F.3d at 323 (internal quotation marks omitted) (emphasis in original). For the latter, we "no longer [permit the plaintiff to] rest on the pleadings", instead examining the summary-judgment evidence. *Id*. (internal quotation marks omitted). Pursuant to our review of such evidence, the § 1983 due-process and equal-protection claims fail for the following reasons.

Procedural-due-process guarantees are invoked when a state actor deprives an individual of a protected life, liberty, or property interest. ***Baldwin v. Daniels***, 250 F.3d 943, 946 (5th Cir. 2001) ("To bring a procedural due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest."). For the § 1983 due-process claim, the complaint states:

> The statutory scheme for discipline of state commissioned New Orleans and Baton Rouge Steamship Pilots, and specifically, LA. R.S. 34:1041 et seq., as applied, unlawfully deprived Michael P. Nance of a protected liberty interest, that is the opportunity to work as a state commissioned New Orleans and Baton Rouge Steamship Pilot free from unlawful discrimination, and further denies Michael P. Nance adequate notice and opportunity to be heard in violation of the 14th Amendment due process clause of the United States constitution.

As discussed, Nance agreed to sanctions being imposed without utilizing a hearing or other state processes. In his brief, he maintains the hearing would have been a "sham". He bases this position on an alleged statement by NOBRA's counsel to Nance's then-counsel: "Look, you know we're going to take his license. We can take his commission. We've done it before".

Viewing the summary-judgment evidence in the requisite light most favorable to Nance, he fails, under current law, to show a

clearly-established procedural-due-process violation. It is questionable whether he shows a protected *liberty* interest, because he does not attempt to show he is a protected public employee for whom a liberty interest could attach. In any event, he does not show he was deprived of procedural due process. (As noted, the district court did *not* appear to base its qualified-immunity denial on this claim. It is not mentioned. Notwithstanding our review being *de novo*, the district court's relying only on equal protection is quite consistent with our holding *no* due-process violation is shown.)

2.

Nance's other § 1983 claim is that the Board violated his Fourteenth Amendment right to the equal protection of the laws. His complaint states: "The application of the alleged rules of the Board of Examiners of NOBRA, was arbitrary and capricious and caused certain persons, including Nance, to receive disparate and unequal treatment in violation of Nance's right to equal protection of the laws". In his brief, he maintains he was discriminated against because of his political affiliation as a supporter of Captain Clayton, who was ousted from the presidency of NOBRA in its 2001 elections.

Traditionally, for an Equal Protection claim, "a § 1983 plaintiff must [show in contesting summary judgment] that a state actor intentionally discriminated against the plaintiff because of

10

membership in a protected class". ***Williams v. Bramer***, 180 F.3d 699, 705 (5th Cir. 1999) (internal quotation omitted). The Supreme Court has explained, however, that the Equal Protection Clause *does* give rise to a claim on behalf of a "class of one" who has *not* alleged membership in a class: "Our cases have recognized successful equal protection claims brought by a 'class of one', where the plaintiff [shows] that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment". ***Vill. of Willowbrook v. Olech***, 528 U.S. 562, 564 (2000). This requires a plaintiff to show standards were applied differently to him than to others *similarly situated*. ***Bryan v. City of Madison***, 213 F.3d 267, 276-77 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001). Alternatively, the plaintiff may show that a government policy or procedure was selectively enforced against him. ***Id.*** at 277. This requires showing "the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right". ***Id***.

"[I]t is clearly established that a state violates the equal protection clause when it treats one set of persons differently from others who are similarly situated". ***Ford Motor Co. v. Tex. Dep't of Transp.***, 264 F.3d 493, 510 (5th Cir. 2001) (internal quotation marks omitted) (alteration in original). What is less clear, and thus probably *not clearly established* as required by

11

step one of qualified-immunity analysis, however, is whether this "class of one" jurisprudence applies outside the zoning land use and assessment context, where it is typically employed. *See **Shipp v. McMahon***, 54 F. App'x 413 (5th Cir. 2002).

We need not determine whether the "class of one" doctrine — much less, whether it is clearly established — applies because Nance's summary judgment evidence fails to demonstrate an equal-protection violation. Although he asserts he received different punishment than other pilots for similar infractions because of his political affiliation with Captain Clayton, he fails to show other pilots were both similarly situated and treated differently. *See **Bryan**,* 213 F.3d at 276-77. Instead, he merely makes unsubstantiated, vague assertions that he and unspecified others received unequal treatment.

### III.

For the foregoing reasons, the qualified-immunity denial for board members Shows, Daniels, and Shirah is **REVERSED** and judgment is **RENDERED** for them.

*REVERSED and RENDERED*

12