**Huey GRANGER, Plaintiff,**

v.

**William (Bill) SLADE, Individually and in His Official Capacity as Chief of Police for the City of Pearl, Mississippi; Keith Peterson, Individually and in His Official Capacity as Police Officer for the City of Pearl, Mississippi; Jeff Thames, Individually and in His Official Capacity as a Police Officer for the City of Pearl, Mississippi, and Jack B. Brenemen, Defendants.**

No. CIV.A. 302CV1209LN.

United States District Court, S.D. Mississippi, Jackson Division.

Feb. 22, 2005.

Shirley Payne, Horn & Payne, PLLC, Madison, MS, for Plaintiffs or Petitioners.

Gary E. Friedman, Mark D. Fijman, Phelps Dunbar, Jackson, MS, James A. Bobo, Akers & Bobo, PLLC, James Edward Rainer, Rainer & Hyche, Orbie S. Craft, Craft, Brenemen & Wilson, Brandon, MS, for Defendants or Respondents.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants William (Bill) Slade, Keith Peterson and Jeff Thames, individually and in their official capacities as police officers for the City of Pearl, Mississippi (to which the court will refer collectively as the Municipal Defendants), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Huey Granger has responded in opposition to the motion and the court, having considered the memoranda of authorities, together with attachments submitted by the parties, concludes that the motion should be granted in part and denied in part.

On August 5, 2002, Huey Granger filed the present action, alleging claims for false arrest, false imprisonment, excessive bail, excessive force, malicious prosecution and civil conspiracy based on certain events which occurred on and after June 2, 2002. Prior to that date, Mr. Granger's daughter, Brendy, had been the subject of Youth Court proceedings in which the State had assumed custody of Brendy. Brendy had been returned to her father's custody, subject to certain conditions, one of which was compliance with an order that directed that she have no contact with a young man, Chris Elbehar. Despite this order, and without her father's knowledge, Brendy had continued to see Elbehar and on the night of June 2, 2002, after her father left work for his night-shift job at Wal–Mart, she telephoned Elbehar to come get her to go for a bite to eat. Elbehar drove to the Granger home and picked up Brendy, and the two went to eat at the Sonic Drive–In. They then returned to Brendy's home. Elbehar parked his car at a neighbor's house and went with Brendy, at her invitation, to her house. Not long after, Mr. Granger arrived at the house (having been advised by his ex-wife that he needed to go home and check on Brendy who was not answering the phone at home). Mr. Granger discovered Elbehar there; Elbehar ran and Mr. Granger took chase and, with the assistance of neighbors, apprehended Elbehar and took him back to the house. Mr. Granger called the police to the scene.

When the police officers, including defendants Peterson and Thames, arrived, Mr. Granger advised them of the Youth Court's "no contact" order and reported that Elbehar had broken in or forced his way into the home. The officers did not arrest Elbehar at the time, but directed that Mr. Granger and Brendy go to the police station to file charges against Elbehar. Before leaving the scene, officers interviewed neighbors, and learned from Brittany Tudor, one of the neighbors, that Elbehar had parked his car in her driveway on more than one occasion when visiting Brendy while Mr. Granger was at work, suggesting that perhaps the story

that Mr. Granger and Brendy had told was not entirely true.

Once Mr. Granger and Brendy arrived at the police station, the officers separated them. The officers interviewed Brendy, who told that officers Chris had not broken in or forced his way into the house but rather had been invited in and that her father had told her to "stick to [her] story and keep lying" (to police) about what had happened.

According to the complaint, the officers then told the Plaintiff that he had to undergo a "lie detector test" by causing him to be restrained by an artificial device over his head, and holding wires alleged to be attached to a computer and to be asked questions while being told that an incorrect response would cause the Plaintiff pain.

. . .

After being questioned about why he would lie, under expressions of disbelief from the defendant officers, the Plaintiff was hit from behind. The blow to his head caused the device over his head to fall to the floor and break. . . .

Plaintiff was told that aspects of his personal life, his upcoming marriage, and the race of his bride to be, all were felonies subjecting him to further prosecutions by the City of Pearl.

Plaintiff was forced to post bond to secure his release. Since there were no charges filed against him, and since the police officers had witnessed no breach of the peace in their presence, any amount of bond was excessive.

Immediately upon his release, plaintiff went to see an attorney, Jack Brenemen, who had previously represented him in getting Brendy returned to Mr. Granger's custody. What transpired between those two is largely in dispute, but it is undisputed that on June 19, 2002, Mr. Granger signed a letter agreement prepared by Mr. Brenemen in which Mr. Granger purport-

edly agreed "not to pursue any litigation in this matter, either against Officers Peterson and [Thames] or the City of Pearl," in exchange for the City's agreement that Officers Peterson and Thames would personally apologize to Granger, be suspended for two weeks without pay, be ineligible for promotion to sergeant for two years and personally reimburse Granger for the cost of his bond ($125), and the City's further agreement that "[t]he charges these officers brought against Mr. Granger [would] be dismissed and the arrest record expunged."

Despite his execution of this settlement agreement, plaintiff filed the present action against the City, the Chief of Police and Officers Peterson and Thames alleging claims for false arrest and imprisonment, excessive bail, excessive force, malicious prosecution and civil conspiracy, and against attorney Brenemen for civil conspiracy. Defendants now seek summary judgment as to all these claims.

This court previously denied a similar motion by the Municipal Defendants to dismiss or, alternatively, for summary judgment based on the settlement agreement. These defendants are now before the court, reurging their position that summary judgment is in order on the basis of plaintiff's having entered a settlement agreement waiving any right to proceed in this action against the Municipal Defendants and/or because the undisputed facts of record entitle the Municipal Defendants to summary judgment on the merits of plaintiff's claims as a matter of law.

As an initial matter, though not particularly relevant in view of the court's ultimate conclusion herein, the court rejects plaintiff's contention that the court's previous denial of summary judgment on the issue of the enforceability of the settlement agreement constitutes "law of the case." *Johnson v. Louisiana Dept. of Agriculture*, 18 F.3d 318, 322 (5th Cir.

1994) ("The doctrine of the law of the case 'merely expresses the practice of courts generally to refuse to reopen what has been decided'."). The prior motion was filed early in the case, before discovery was completed, and did not include evidence that was later developed during discovery. Accordingly, defendants are not precluded from again seeking summary judgment on the basis of the settlement agreement. *See United States v. Horton,* 622 F.2d 144, 148 (5th Cir.1980) ("While the ruling on the motion for partial summary judgment is the law of the case on the issues decided, this ruling is not immutable and has no res judicata effect.... The doctrine of law of the case is not inflexible; the earlier ruling, which is not res judicata, may be reconsidered in the interest of judicial economy."). However, having examined the evidence submitted by defendants in support of their renewed motion, the court still is not persuaded that evidence pertaining to the settlement agreement supports judgment in favor of the defendants as a matter of law. As noted by defendants, the court indicated in its earlier opinion that insufficient facts had been presented to allow the court to conclude as a matter of law that the settlement agreement was necessarily binding on Granger given his allegation and presentation of evidence in an attempt to demonstrate "a collusive scheme between the City and attorney Brenemen to trick and/or coerce plaintiff into dropping any civil claims he might have had against the City and Officers Peterson and [Thames]." The court recognized that Granger's "position with respect to the putative release-dismissal agreement is, and has been from the outset, that in getting him to sign the agreement, attorney Brenemen was operating in collusion with the City," and that

Granger had presented proof which he claimed tended to demonstrate, circumstantially, the existence of collusion between Brenemen and the City. Defendants submit that in view of the record as it currently stands, with a fuller presentation of proof, including deposition testimony from Mr. Granger, Mr. Brenemen and Chief Slade, there is no basis upon which one could reasonably find that Brenemen colluded with the City to trick Mr. Granger into waiving his claims against the City. While it is true that Mr. Granger testified that he has no direct proof of a conspiracy between Mr. Brenemen and the City, he continued to maintain in his deposition that Mr. Brenemen informed him it was urgent that he sign the waiver agreement immediately in order to avoid being jailed and charged with something "bad" that would cost him a lot of money in attorney's fees for a defense. In the court's opinion, if Mr. Granger's testimony is true, which it must be presumed to be for purposes of resolving the present motion,[1] the scenario he describes is suggestive of something more than merely poor lawyering (though it is certainly that, too), namely, a desire by Mr. Brenemen to protect the City's interest at the expense of his putative client's interest which is, in turn, suggestive of collusion by him with the City. Accordingly, the court must again conclude that summary judgment cannot be granted based on the alleged settlement agreement.

The court thus turns to the merits of plaintiff's claims, to which the present motion is addressed in the alternative. Plaintiff has alleged claims in this cause pursuant to 42 U.S.C. § 1983 for false arrest/false imprisonment, malicious prosecution, excessive bond, excessive force,

---

1. Of course, Mr. Brenemen has testified to a dramatically different version of events which, if ultimately found to be true, would compel a conclusion that Mr. Granger is bound by the settlement agreement and thus foreclosed from pursuing any of his claims herein.

and civil conspiracy. The Municipal Defendants' arguments in support of their request for summary judgment with respect to each of these claims are considered seriatim.

▮▮▮ The Municipal Defendants argue that plaintiff's claims for false arrest and imprisonment and for malicious prosecution [2] fail as a matter of law because absence of probable cause is an essential element of these causes of action [3] and yet the record evidence establishes beyond dispute that probable cause existed to arrest, detain and charge Mr. Granger with providing false information of a crime to law enforcement officers in violation of Miss.Code Ann. § 97–35–47, which makes

it unlawful "for any person to report a crime or any element of a crime to any law enforcement ... officer, by any means, knowing that such report is false."

In *Haggerty v. Texas Southern University*, the Fifth Circuit defined "probable cause," stating, "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." 391 F.3d 653, 655–56 (5th Cir.2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir.2001)).

In the case at bar, it is undisputed that the officers had been told, and had reason

**2.** Plaintiff's complaint alleges, without elaboration, that "[t]he plaintiff was subjected to malicious prosecution in violation of the Fourth and Fourteenth Amendments to the United States Constitution." The Fifth Circuit has made it clear that in this circuit, "[t]here is no longer a freestanding section 1983 claim for malicious prosecution," *Figgs v. Vrazel*, 106 Fed.Appx. 260, 261 (5th Cir. 2004), so that a claim against the City for malicious prosecution based on an allegation that the City initiated criminal proceedings against Mr. Granger without probable cause "does not state a claim." In *Castellano v. Fragozo*, the court explained as follows:

> [C]ausing charges to be filed without probable cause will not without more violate the Constitution. So defined, the assertion of malicious prosecution states no constitutional claim. It is equally apparent that additional government acts that may attend the initiation of a criminal charge could give rise to claims of constitutional deprivation. The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution

and labeling them as such only invites confusion.

352 F.3d 939, 953–954 (5th Cir.2003). In the case at bar, Mr. Granger was arrested and detained, i.e., "seized," allegedly in violation of the Fourth Amendment. However, beyond that initial seizure and detention, which is the subject of his false arrest/imprisonment claim, he was not "prosecuted" further. Accordingly, it would seem he has no cognizable claim for malicious prosecution. Nevertheless, if he had stated a claim for malicious prosecution, the court's conclusion *infra* that the officers had probable cause to arrest and charge Mr. Granger with providing false information to police, is fatal to the claim. *See Figgs*, 106 Fed.Appx. at 261 (holding that putative malicious prosecution claim, even if properly stated, was properly dismissed in view of district court's conclusion that officer had probable cause for initiating disciplinary proceeding against the plaintiff).

**3.** *See supra* note 2 as to the malicious prosecution claim. As to the false arrest/false imprisonment claim, *see Haggerty v. Texas Southern Univ.*, 391 F.3d 653, 655–56 (5th Cir.2004) ("To ultimately prevail on his section 1983 false arrest/false imprisonment claim, [the plaintiff] must show that [the officers] did not have probable cause to arrest him."); *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir.2001) ("The 'constitutional torts' of false arrest ... and false imprisonment ... require a showing of no probable cause.").

to believe, that Mr. Granger had made a knowingly false statement to the police that Chris Elbehar had broken into or forced his way into the Granger home.[4] It would thus seem evident that they had probable cause to believe that Mr. Granger had violated the false information statute. Plaintiff argues, though, that the statute only criminalizes intentionally false statements leading to the charge of a crime and does not criminalize false statements made by mistake or mistaken reliance on someone else. He concludes that since he "did not intend to give false information when he repeated to the officers the mistaken information he had gotten from his daughter when she lied about allowing Elbehar into the house," and more importantly, did not give false information about the elements *of a crime,* then it follows that the officers could not have had probable cause to believe he had violated the false information statute. In the court's opinion, plaintiff's arguments are misguided, at best.

Plaintiff insists that he did not actually tell the officers that Elbehar had broken into the home but rather simply told officers that Brendy had told him that Elbehar had forced his way in. He thus argues that he did not provide them with any false information, and that he certainly did not intentionally or knowingly provide false information to the officers. However, given Brendy's statement to the police that her father had told her to lie to the officers and to say that Elbehar had broken in, the police clearly would have been justified in concluding that Mr. Granger knew the truth, i.e., that Elbehar had been invited in by Brendy, and knew that Brendy's statement about how Elbehar got into the home was fabricated and that he instructed

Brendy to lie to police so that she could avoid getting into trouble herself. In other words, the officers had reasonable cause to believe that Mr. Granger had knowingly provided them with false information.

Moreover, in the court's opinion, despite plaintiff's arguments to the contrary, the officers could also reasonably have concluded that the false information he gave was as to a crime, or the elements of a crime. In his response brief, plaintiff argues that because Elbehar's presence on the Granger property was a violation of a Youth Court "no-contact" order, then his presence constituted a crime or crimes, namely, contempt of court and/or trespass, regardless of whether Elbehar had been invited into the home by Brendy or had forced his way in without permission or authorization. In support of this argument, plaintiff refers to the statutory definition of criminal trespass, which states that a criminal trespass occurs "if any person ... shall without authority of law go into or upon or remain in any building, premises or land of another ... *after having been forbidden to do so,* either orally or in writing ... *by any* owner, or lessee, or custodian, or other *authorized person.*" (Emphasis added). Plaintiff submits that the Youth Court Judge was an "authorized person" who had forbidden Elbehar from having contact with Brendy. He also notes that on the night of the incident, he did, in fact, tell officers about the "no contact" order and informed them that Elbehar had violated that order so that the officers knew that Elbehar was guilty of contempt of court and of violating the criminal trespass statute regardless of whether he had physically broken into or forced his way into the home. Granger thus contends that any additional informa-

4. Although Brendy Granger has now testified that her father did not, in fact, tell her to lie to police officers, she admits that at the time of the incident in question, she told the officers that her father had told her to "stick to my story and keep lying" about Elbehar's breaking into the Granger home.

tion that he may have provided to police, i.e., his false report that Elbehar had broken in, was irrelevant and hence could not have formed the basis for probable cause.

The court would accept, solely for the sake of argument, that the officers may have had probable cause to believe that the mere fact of Elbehar's presence in the Granger home was a crime, regardless of how he had come to be in the home, in view of the Youth Court "no contact" order.[5] However, in the court's opinion, even if that is so, it still cannot reasonably be disputed, either as a matter of fact or of law, that Mr. Granger's statement to officers that Elbehar broke into the home was a knowingly false statement as to the element of a crime. Indeed, whereas plaintiff argues that Granger's statement to the officers that Elbehar had broken in was immaterial, one could just as reasonably (or even more reasonably) argue that Mr. Granger's statement to police that Elbehar's presence violated the "no contact" order was immaterial or irrelevant given

Mr. Granger's representation to police that Elbehar had broken into the home, unquestionably a criminal offense. In sum, the court rejects plaintiff's argument that the evidence in this case would reasonably support a conclusion that the officers lacked probable cause either to arrest Mr. Granger or to charge him with violation of the "false information" statute. It follows that all the Municipal Defendants are entitled to summary judgment on plaintiff's claims for false arrest and imprisonment and for malicious prosecution.

 Even if the court were not able to conclude as a matter of law that probable cause existed, all of the Municipal Defendants would still be entitled to summary judgment with respect to these claims. In this regard, Officers Peterson and Thames contend that they are entitled to summary judgment as to these claims on the basis of their defense of qualified immunity, and the court agrees.[6] In *Haggerty*, the Fifth Circuit explained that an officer in the position of these defendants

5. For its part, the court is not convinced that this is the case. So far as the court is aware, the Youth Court's "no contact" order was issued by the Youth Court pursuant to its exercise of jurisdiction over Brendy Granger, and directed that she have no contact with Elbehar. It is not clear to the court that the Youth Court's jurisdiction extended to Elbehar, nor does it seem that any putative violation by Elbehar of the order, even if it did constitute contempt of court, would necessarily have constituted a *crime*. It is hardly apparent that Elbehar committed a trespass because he was in a place where Brendy Granger was located in violation of the "no contact" order. If that were the case, then it could also be contended that Elbehar was trespassing while having a burger with Brendy Granger at the Sonic Drive-In. On the other hand, if Elbehar had broken into the Granger home, as reported by both Brendy and Mr. Granger, a crime most certainly would have been committed, regardless of whether Brendy was in the home at the time.

6. On the same day Municipal Defendants filed their motion for summary judgment, they also filed in this cause their answer, which includ-

ed, *inter alia*, the individual defendants' defense of qualified immunity. In his response to the motion, plaintiff argued that Municipal Defendants' answer should be stricken and default judgment entered against them based on the late filing of their answer without leave of court and without a showing of good cause. Plaintiff also argued that the individual Municipal Defendants had waived their defense of qualified immunity by failing to assert the defense in a timely manner. Thereafter, and in response to plaintiff's objections, Municipal Defendants filed a motion for leave to file answer out-of-time and to amend and to deny plaintiff's request for default judgment.

Taking into account the procedural history of this case, and with reference, in particular, to the fact that the focus from the outset and for an extended period of time was on the question whether the case should proceed at all in view of the settlement agreement, which Mr. Granger admittedly signed, the court views these defendants' failure to file their answer in a more timely manner excusable and finds that plaintiff has in no way been prejudiced by this circumstance. Accordingly, the court rejects plaintiff's request to strike the answer or to enter a default judgment.

is entitled, in fact, to qualified immunity if a reasonable officer in his position could have believed that, in light of the totality of the facts and circumstances of which [they were] aware, there was a fair probability that [Mr. Granger] had committed or was committing an offense. *See ... United States v. Watson*, 273 F.3d 599, 602 (5th Cir.2001) (explaining that probable cause's "fair probability" requires more than a bare suspicion but less than a preponderance of evidence). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (emphasis added) (internal quotation and citation omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987) ("... it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable"). In sum, [Mr. Granger] "must clear a significant hurdle to defeat [Peterson's and Thames'] qualified immunity." *Brown*, 243 F.3d at 190. "[T]here must not even arguably be probable cause for the ... arrest for immunity to be lost." *Id.* (internal quotation and citation omitted).

*Haggerty*, 391 F.3d at 655–56. In this case, the court concludes without hesitation that probable cause at least arguably existed for the arrest and detention of Mr. Granger, so that Officers Thames and Peterson would be entitled to qualified immunity for their actions in this regard.

■ Moreover, there is no allegation or proof that Chief Slade had any involvement in the decision to arrest and/or detain Mr. Granger and thus there is no basis for holding him liable, nor is there any basis for holding the City liable for the alleged false arrest and imprisonment of Mr. Granger.[7]

■ The Municipal Defendants also argue that they are entitled to summary judgment on plaintiff's claim for excessive bail in violation of the Eighth Amendment. In this regard, they note that "bail is excessive under the Eighth Amendment only when it is set in an amount greater than that required for reasonable assurance of the presence of the defendant." *United States v. Salerno*, 481 U.S. 739, 752, 107 S.Ct. 2095, 2104, 95 L.Ed.2d 697 (1987). *See also Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir.1978) (the determination whether bail is excessive turns on "a balancing of the pre-trial detainee's right to ... be free from punishment prior to conviction, against the state's interest in ensuring his presence at a later trial"). In this case, the record shows without contradiction that Mr. Granger was able to se-

---

The court thus will grant these defendants' motion to file their answer out-of-time. For essentially the same reasons, including the court's implicit conclusion that defendants' failure to have more timely asserted the defense was not merely a dilatory tactic, the court, in its discretion, concludes that the qualified immunity defense has not been waived.

7. The court would note that although the complaint broadly asserts causes of action

without identifying the defendant or defendants to which specific claims are directed, it does not appear, from a review of plaintiff's response brief, that plaintiff intends to assert these particular claims against the City or against Chief Slade, individually. Nevertheless, in view of the lack of clarity in the complaint and in an abundance of caution, the court addresses each claim as though it is intended to be asserted against each defendant.

cure his release on bond for $125 on the night of his arrest and was released from jail after approximately an hour or two. The Municipal Defendants submit that under these circumstances, summary judgment is plainly proper. In response to the motion on this claim, Mr. Granger argues simply that "[s]ince zero amount of bail was justified under the circumstances (given that there was no probable cause to arrest or charge Mr. Granger, any amount {of bail) was excessive and punitive." The court has already concluded, however, that the officers had probable cause for Mr. Granger's arrest. Consequently, the court concludes that the motion is well taken as to plaintiff's claim for excessive bail.

The Municipal Defendants' motion is well taken, also, as to plaintiff's claim of excessive force against the City (which, of course, includes the claim against Chief Slade and Officers Peterson and Thames in their official capacities).[8] The law as to municipal liability is clear:

> [M]unicipalities are not liable on a *respondeat superior* basis; that is, a municipality cannot be held liable simply by virtue of the fact that one of its employees violated a person's federal rights. For a municipality to be liable, the municipality itself must cause the violation through its policies. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, in-

flicts the injury that the government as an entity is responsible under § 1983." *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 625 (5th Cir.2004) (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

In their motion, the Municipal Defendants argue that the City (including the officers in their official capacity) is entitled to summary judgment since plaintiff cannot establish an official policy of arrestees being subjected to fake lie detector tests or excessive force or, more generally, of mistreating retarded persons. In response, plaintiff maintains that he has sufficient evidence to create a triable fact on the issue of municipal liability, arguing, as he does, that a jury issue is presented as to "whether Chief Slade knew or should have known of the practice of using a phone (sic) lie detector and terrorizing citizens of limited intellectual capacity." The record evidence, however, when viewed fairly and objectively, does not support plaintiff's argument.

Although plaintiff's response does not clearly identify the basis for any claim that a policy existed that would subject the City to liability, insofar as the use of the fake lie detector device goes, he appears to be claiming that because Chief Slade, who is undeniably an official policymaker for the City, either knew or should have known of the existence of the fake lie detector device and failed to take steps to stop or prevent

---

8. As the Fifth Circuit has explained numerous times, including most recently in *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 414 (5th Cir.2004),

> "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *accord Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official-capacity

suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (citations and internal quotation marks omitted)).

use of the device, he thereby implicitly condoned its use, thus giving rise to an official City policy of condoning the use of the fake lie detector test.

In *Milam*, the court observed that "[m]unicipal policy can take several guises." *Id.* It can be a "formal policy," in the form of formal pronouncements, ordinances or the like, *id.*, but is not so limited. Liability may also be imposed upon a municipality

for deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Cases have recognized that municipal custom can sometimes be proven through evidence of a persistent pattern of conduct. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) (referring to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law" (internal quotation marks omitted)); *Bennett v. City of Slidell*, 728 F.2d 762, 767–68 (5th Cir.1984) (en banc). That is, the existence of a persistent pattern of illegal conduct, tolerated by municipal policymakers, tends to show that the subject conduct does not represent an unauthorized departure from lawful policy but instead represents the realization of an *unlawful* policy. Thus, we have on several occasions upheld findings of municipal liability that were predicated on patterns of illegality that rose to the level of customary policy.

*Milam*, 113 Fed.Appx. at 625. In addition, "[m]unicipalities can ... be liable, in certain situations, for single episodes of conduct that are not part of any pattern of illegality," as, for example, where there has been a single instance of conduct "perpetrated by [the municipality's] policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions." *Id.* (citations omitted). Further, there can be situations in which "a municipality could be held liable for a single episode of conduct initiated by a non-policymaker employee," such as where a policymaker "ratifies" a subordinate's illegal conduct, "thus putting the force of municipal policy behind it." *Id.* (citations omitted). This "ratification theory" of municipal liability is necessarily limited to situations in which the policymaker is actually aware of the subordinate's unlawful action and has in some manner given that action his stamp of approval. *See id.* ("Policymakers alone can create municipal liability, and so any violation must be causally traceable to them, not just to their subordinates.").

In the case at bar, there obviously was no formal policy authorizing the use of fake lie detector tests or of using excessive force. Rather, plaintiff's policy theory is that Chief Slade knew of the existence and/or use of the fake lie detector test and by failing to prevent its continued use, tacitly condoned its use. The evidence, however, does not support this theory. Contrary to plaintiff's insinuation, there is no evidence that the fake lie detector device had been used on any occasion other than the single occasion involving Mr. Granger. On the contrary, the evidence establishes without contradiction that this was the only time it was ever used, and Chief Slade had no involvement in its use on that occasion.[9]

---

9. Plaintiff appears to suggest that Chief Slade's failure to take affirmative steps to stop use of the device *after* he learned of its use on Mr. Granger amounted to ratification or tacit approval of its use. This position is unsup-

Plaintiff argues additionally that the City had a policy or custom (i.e., a widespread pattern and practice) of mistreating mentally retarded persons, and points in support of this charge to an affidavit from Rebecca Floyd in which she asserts that there have been numerous reports of harassment of retarded people by the Pearl Police Department. As the movants correctly contend, however, Ms. Floyd's affidavit is based on what she was told by other unknown and unnamed individuals and as such, constitutes inadmissible hearsay. *See* Fed.R.Evid. 802.

In view of the clear absence of evidence tending to create a triable issue of fact as to the existence of municipal policy, the court concludes that the City is entitled to summary judgment.

 That leaves for consideration only the claims against Officers Peterson and Thames for summary judgment on plaintiff's excessive force claim. Defendants argue that plaintiff has no claim for excessive force against either Officer Peterson or Officer Thames because Officer Peterson did not strike the plaintiff but rather only struck the street light globe that had been placed on Mr. Granger's head and because any purported injury claimed by Mr. Granger is de minimis. Further, they contend that because Officer Thames was not in the room at the time the blow occurred, he cannot be held liable. They also argue that Mr. Granger's excessive force claim relating to being handcuffed

too tightly is without merit given clear Fifth Circuit precedent that discomfort during a "handcuffing procedure" is insufficient to support an excessive force claim. In the court's opinion, the motion is well taken as it pertains to the claim based on handcuffing, *see Glenn v. City of Tyler,* 242 F.3d 307, 314 (5th Cir.2001) (handcuffing too tightly, without more, does not amount to excessive force), but is otherwise without merit.

Defendants do not contend that the use of force was reasonable under the circumstances, namely, a custodial interrogation in which the subject posed no threat of any sort.[10] Moreover, the suggestion that Peterson cannot be liable because his hand did not come into contact with Mr. Granger's head but only with the globe that was perched on his head verges on frivolous. Defendants' argument that Mr. Granger suffered, at most, a de minimis injury is much stronger but still does not entitle them to summary judgment.

To support a claim for excessive force, plaintiff is not required to show that he suffered a substantial injury, but he must show that his injury was more than de minimis. Here, it is questionable whether he has sustained his burden in this regard. Mr. Granger claims that he has continued to suffer headaches and dizziness as a result of the blow struck to the back of his head, yet he has never sought medical attention for these alleged symptoms. *Cf. Siglar v. Hightower,* 112 F.3d 191 (5th

---

portable as a matter of law. In *Milam,* the court rejected a similar argument, stating: That the policymakers failed to take disciplinary action in response to Milam's complaints does not show that they knew of and approved the illegal character of the arrest, determining that it accorded with municipal policy. Second, it is hard to see how a policymaker's ineffectual or nonexistent response to an incident, which occurs well *after* the fact of the constitutional deprivation, could have *caused* the deprivation.

*Milam,* 113 Fed.Appx. at 627–28.

**10.** *See Ware v. Reed,* 709 F.2d 345, 351 (5th Cir.1983) (the use of nearly any amount of force may result in a constitutional violation when a suspect "poses no threat to [the officers'] safety or that of others, and [the suspect] does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified").

Cir.1997) (finding that where a guard twisted a prisoner's arm and twisted his ear, resulting in bruising and soreness for three days, the injury was de minimis). However, plaintiff claims that he has suffered psychological harm from the incident.

In *Flores v. City of Palacios,* the Fifth Circuit rejected an argument that "psychological injuries alone are never sufficient to sustain a Fourth Amendment claim," and explained,

> A plaintiff alleging an excessive force violation must show that she has suffered "at least some injury." *Jackson v. R.E. Culbertson,* 984 F.2d 699, 700 (5th Cir.1993). While certain injuries are so slight that they will never satisfy the injury element, *see, e.g., Glenn,* 242 F.3d at 314 (holding that "handcuffing too tightly, without more, does not amount to excessive force"), psychological injuries may sustain a Fourth Amendment claim. *See Dunn v. Denk,* 79 F.3d 401, 402 (5th Cir.1996) (en banc). The plaintiff's physical injuries in *Dunn* were only bruises, but she suffered substantial psychological injuries. *Id.* We held that she alleged an injury sufficient to demonstrate the violation of a clearly established constitutional right. *Id.* at 402–03.

*Flores v. City of Palacios,* 381 F.3d 391, 398 (5th Cir.2004). Defendants' submissions relative to their motion fail to address this aspect of plaintiff's claimed injury, which leads the court to conclude that they have not sustained their burden to demonstrate either Officer Peterson's or Officer Thames' entitlement to summary judgment.[11]

Based on the foregoing, it is ordered that the Municipal Defendants' motion for summary judgment is denied as to plaintiff's excessive force claims against Officers Peterson and Thames in their individual capacities, but is otherwise granted.[12]

---

11. Although Officer Thames was not in the room when the blow was struck to Mr. Granger's head, he was involved in administering the fake lie detector test and threatening Mr. Granger with pain if he answered any question falsely.

12. In her response, plaintiff requests the court to dissolve the protective order sealing the videotape and any mention of it. The court rejects this request.